The opinion of the court was delivered by
Beier, J.:
Defendant Matthew T. Fisher appeals his jury trial convictions of attempted second-degree murder and criminal damage to property, which arose out of a fight with a roommate.
Fisher raises seven issues on appeal; (1) whether the prosecutor ran afoul of Doyle v. Ohio, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 91 (1976), during his cross-examination of Fisher; (2) whether the prosecutor committed misconduct during closing argument; (3) whether the district court judge should have instructed the jury on the lesser .included offense of attempted voluntary manslaughter; (4) whether the district judge erred by telling the *244 jury at the beginning of the trial that a mistrial attributable to jury misconduct would be a burden on the parties and taxpayers; (5) whether the criminal damage conviction was supported by sufficient evidence; (6) whether cumulative error deprived Fisher of a fair trial; and (7) whether the district judge erred in determining Fisher’s criminal history score.
As detailed below, we ultimately reject Fishers arguments and affirm his convictions and sentence.
Factual and Procedural Background
At the time of the crimes, Fisher lived with his friend Tim Worth-en and Tim’s ex-wife, Angelique Worthen (Angel). Tim was the sole owner of the house the three shared. Fisher and Tim spent the day drinking, first at Tim’s house and then at bars. After Tim left to pick Angel up from work, Fisher headed home on foot. On the way, he encountered police officers twice, tire second time right outside of the house.
As a result of the second police encounter, Fisher became belligerent. He lacked a door open inside the house, damaging the door. Then, while back outside the house, Fisher hit Tim, who then went inside next-door neighbor Corby Stevens’ house. Eventually, Fisher and Angel ended up in a physical fight that left Angel with fife-threatening injuries. Although Stevens’ windows were open, both she and Tim denied hearing the fight between Fisher and Angel. Fisher left the scene in Tim’s car, but he wrecked the car within a few blocks of the house.
Responding officers and emergency medical technicians would eventually testily that Fisher kept mentioning Tim’s address. They also observed that he was covered in an amount of blood inconsistent with the seriousness of his own injuries. A medical technician would testify that Fisher’s wounds appeared to be defensive. Fisher was acting paranoid, refused an IV, and referred to an “assassin.” Based on Fisher’s behavior and his repeated references to Tim’s address, officers requested a welfare check at the house. Meanwhile, Fisher was transported to the hospital.
When officers arrived at the house, they found Angel lying in a large pool of blood. Her injuries were so extensive that one officer *245 initially thought she was dead, and one of the medical technicians would eventually testify that he could not immediately tell whether the victim was a man or a woman. But Angel was able to tell the police that “Matt” had hurt her.
Soon after Fisher arrived at the hospital, he told officers that Angel had attacked him and that he had defended himself. He also expressed concern for Tims safety and said that he feared Angel and Stevens had kidnapped him. He claimed to have left the house to go to the hospital for help. After receiving Miranda warnings, Fisher also admitted to telling Angel he would kill her if she did not reveal Tim’s whereabouts.
The next morning, Fisher spoke to a different officer, telling her that he had hit Angel because she would not reveal Tim s location. He did not mention self-defense.
The State charged Fisher with attempted murder in the second degree or, in the alternative, aggravated battery. He also was charged with criminal damage to property because of the door he lacked open inside the house.
At trial, after empaneling the jury, the district judge told jurors about the rules and restrictions governing their service. The judge then stated:
“Any juror who violates these restrictions, as I’ve explained to you, jeopardizes the fairness of these proceedings and a mistrial could result which would require the entire process to start over. As you can imagine, a mistrial is a tremendous expense and inconvenience to the parties, tire Court, and the taxpayers.”
At trial, Angel testified that she could not remember much of what happened on the night of the crimes. Tim testified that he had heard Stevens yell out her window that she would not let Tim leave her house.
During direct examination, Fisher said he could not “really remember” talking to police at different times. Fisher testified that Angel had said she received training in hand-to-hand combat while in the Navy. Fisher also testified that Angel started the fight with him by jumping on his back. He asserted that he acted in self-defense when he struck her, pushed her, and stepped on her chest after she had fallen to the ground. Defense counsel asked Fisher *246 if he “ever [got] the opportunity to explain the details of what happened in context.” Fisher responded:
“I had.. . . [S]everal officers had asked me what had happened. . . . And I was of the frame of mind that, you know, they’re not going to believe you because the first officer that asked me that, I remember asking, he replied like he didn’t believe me so, you know, it is land of hard to believe.”
During cross-examination, the prosecutor and Fisher engaged in the following exchange:
“PROSECUTOR: When you were aware that maybe you didn’t quite tell the police exactly what happened, did you ever contact police and tell them you needed to talk to give a more definitive statement about what happened .. . that night?
“FISHER: No.
“PROSECUTOR: Never said a word about these things until today?
“DEFENSE COUNSEL: Your honor, in light of the legal proceedings, I believe that encroaches his Constitutional rights, we would object.
“PROSECUTOR: I made — I know the case law, Judge, there’s absolutely no reference made to his status. It was only an inquiiy as to whether he elected—
“DISTRICT JUDGE: Overruled, you can ask the question about making contact or not making contact.”
During the jury instructions conference, the district judge said he would instruct the jury on attempted second-degree murder, aggravated battery by knowingly causing great bodily harm, and reckless aggravated battery. The judge also intended to give a self-defense instruction. The district judge did not instruct on attempted voluntary manslaughter as a lesser included offense, and Fisher did not object to that omission.
The criminal damage instruction required the State to prove:
“I. [Angel] had an interest in property described as a door;
2. [Fisher] knowingly damaged, destroyed, defaced or substantially impaired the use of property by means other than by fire or explosive;
3. [Fisher] did so without consent of [Angel].”
During closing argument, the prosecutor told the jury,
“And I suggest to you when you look at that evidence what you can see by your common knowledge and experience is that it didn’t start [alongside] of that car, and, one, if you believe it’s self-defense, it doesn’t apply because it’s excessive. He *247 had her loosened. He had her away from him. And then he beats tire living hell out of her and Mils her — about Mils her.”
The prosecutor tiren suggested what had happened on the night of the crimes, focusing on photographs of the scene, the extent of Angels injuries, and Fishers testimony that he had hit Angel seven or eight times. He continued:
“The testimony was quite clear. She’s lying there motionless. You heard the tape of her trying to say who did it in the hospital.
[[Image here]]
“You can’t even tell it’s a woman anymore, but he wants you to believe it’s self-defense. Whatever triggered it, whatever caused him to decide enough was enough with that woman, he took advantage of that and he beat her and beat her with the intent to Mil her. .. [T]here is no way in this world the State will assert to you anything but that he intentionally attempted to Mil Angel.”
In his closing, Fishers counsel argued that Angel had started the fight in an attempt to keep Tims whereabouts hidden from Fisher. He pointed out that Angel had induced Fisher to believe she had hand-to-hand combat training. He said that Fisher was merely concerned for Tim and his own welfare and that the situation got “bad in a hurry.” Fisher caused Angels injuries but had no intent to kill her, only to repel a perceived attack. Fishers counsel also pointed out that Angel did not own the interior door that had been damaged.
In the rebuttal portion of his closing, the prosecutor stated:
“The State put every bit of evidence it had and most of that came from that man, himself, whether it was in the hospital or his assertion today that it was self-defense. How self-serving. How self-serving.
“. . . Well, let’s take his theory, it was with an elbow, of course they weren’t on Iris hands. He beat the living heclc out of her with his elbow. Pick one. Pick self-defense. His super attack from behind that was going to result in his belief, in imminent death or great bodily harm? Bull. . . Take his version. His self-defense isn’t allowed at that point. And one way or the other, that blood’s still where it was and all over everywhere and she’s still laying there dying. I, in my entire life, . . . never can you say, well, it wasn’t an attempted murder because she didn’t die. State will continue to assert self-defense isn’t worth the response. He intentionally, for whatever reason, whatever it was that triggered in his mind over his bro, Tim, intentionally was going to Mil Angel []. He meant to do it.”
The prosecutor also said, “[Fisher] wasn’t really saying he was *248 going to die. He wanted whoever it was off of. . . him and then he kept beating her. When he realized who it was, he didn’t stop.”
After the jury returned its guilty verdicts, Fisher was sentenced to a prison term of 247 months. On the criminal damage conviction, the district judge noted that “the evidence was not substantial ... that the property claimed to be damaged... was actually owned by [Angel].”
The Court of Appeals rejected Fishers appellate challenges, State v. Fisher, No. 109,706, 2014 WL 3731928 (Kan. App. 2015) (unpublished opinion), and we granted his petition for review.
Doyle Violation
Fisher first argues that the State’s introduction of evidence about his post-Miranda silence violated Doyle v. Ohio, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 91 (1976).
Review of whether a defendant’s constitutional rights, as protected by Doyle, were violated “involves a question of law that is reviewed de novo.” State v. Reed, 300 Kan. 494, 509, 332 P.3d 172 (2014). If we rule that there was Doyle error, we must determine whether the error was harmless by examining it in the context of the record as a whole, see State v. Hernandez, 284 Kan. 74, 95, 159 P.3d 950 (2007) (each case must be scrutinized in the light of trial record as whole; incidents not viewed in isolation), and by considering how the district judge dealt with the error when it arose. State v. Ward, 292 Kan. 541, 569-70, 256 P.3d 801 (2011).
“[T]he error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.” 292 Kan. 541, Syl. ¶ 6.
It is generally impermissible for the State to impeach a defendant with tire defendant’s post-Miranda silence. Doyle, 426 U.S. at 619; see also State v. Hernandez, 284 Kan. 74, Syl. ¶ 3, 159 P.3d 950 (2007) (applying Doyle). A prosecutor may not “imply[] that the defendant had a -post-Miranda, pretrial obligation to reveal to the police or prosecutor the substance of the defendant’s trial testimony.” State v. Kemble, 291 Kan. 109, 122, 238 P.3d 251 (2010). *249 The same protections apply to the defendant who had “some discussion with the police” but “remain[ed] silent as to matters later asserted at trial,” regardless of whether the defendant expressly invoked his or her right to remain silent. State v. Clark, 223 Kan. 83, 89, 574 P.2d 174 (1977).
But the protections of Doyle have limits. A defendants silence before given Miranda warnings and his or her statements after given the warnings are fair game. See Hernandez, 284 Kan. at 82 (no Doyle violation when prosecutor refers to defendant’s pre-Miranda silence); see also State v. Drayton, 285 Kan. 689, 707-08, 175 P.3d 861 (2008) (no Doyle violation when prosecutor impeaches defendants trial testimony through use of a prior inconsistent statement made after Miranda warnings given). When considering whether a line of questioning violates Doyle, “[t]he determinative question ... is whether the discussion centered on what was not said during the interview (the defendants right to remain silent) or what was said but now called into question (impeachment by way of prior inconsistent statements.)” Hernandez, 284 Kan. at 91. And a prosecutor may impeach the defendant on his or her post-arrest silence in exceptional circumstances, such as when a defendant opens the door by suggesting he or she fully cooperated with an investigation by sharing all that was known. State v. Tully, 293 Kan. 176, 192-93, 262 P.3d 314 (2014).
In addition, a Doyle violation does not make reversal of a conviction automatic. We have upheld convictions when, for example, evidence of a defendant’s guilt was overwhelming or such evidence combined with odrer factors. See, e.g., Hernandez, 284 Kan. at 95 (evidence of guilt overwhelming). When we have reversed a conviction based on a Doyle violation, the factfinders assessment of the defendant’s credibility has tended to be a central issue at trial. See State v. Santos-Vega, 299 Kan. 11, 321 P.3d 1 (2014) (district judge gave no admonition or curative instruction; verdict dependent on whether jury believed victim or defendant); see also Tully, 293 Kan. at 194 (district judge took no remedial action; verdict hinged on defendant’s credibility); State v. Kemble, 291 Kan. at 124-25 (outcome dependent on evaluation of defendant’s credibility; prosecutor’s improper reference to defendant’s silence addressed theory of defense).
*250 Turning to this case, Fisher claims the prosecutor violated Doyle when he asked Fisher if he “ever contacted] police and [told] them [he] needed to talk to give a more definitive statement about what happened . . . that night,” and followed with, “Never said a word about these things until today?”
Fisher had never expressly invoked his right to remain silent, and he had provided post-Miranda statements to at least three officers while in the hospital, but neither obligated him to volunteer his exculpatory story, and the prosecutor committed a Doyle violation by suggesting otherwise to the jury. Clark, 223 Kan. at 89; see Drayton, 285 Kan. at 707-08. The prosecutors remarks cannot be fairly categorized as proper comment on Fishers pre-Miranda silence or on inconsistencies between post-Miranda statements and Fishers trial testimony. See Kemble, 291 Kan. at 122-23 (statement that defendant never said drunkenness affected memory “until today” impermissibly implied defendant had post-Miranda, pretrial duty to reveal his testimony). If the prosecutor intended to impeach by pointing out inconsistencies among Fishers statements, the prosecutor needed to focus on what Fisher did say during police interviews, such as his admission that he hit Angel because she would not tell him where Tim was, instead of focusing on what Fisher did not say. See Hernandez, 284 Kan. at 91.
Our analysis does not end, however, with a ruling that there was error. We must determine whether the error was harmless.
“Roth the United States Supreme Court and this court have emphasized the importance of respecting the protections of Doyle because ‘every post-arrest silence is insolubly ambiguous.’” Santos-Vega, 299 Kan. at 26 (citing Doyle, 426 U.S. at 617). Here, it was undisputed that Fisher was the one who caused Angel’s severe injuries. But his guilt depended on whether the jury believed his most sympathetic version of events — that Angel had instigated the attack on him and that he was acting in self-defense.
In such a case, a prosecutor can flirt with disaster by alluding to a defendant’s post-Miranda silence. In this particular case, disaster was avoided because the prosecutor also thoroughly impeached Fisher’s credibility by emphasizing the inconsistent content of the communications when Fisher was not silent. Any further negative *251 impact on Fisher’s credibility arising from the prosecutors two references to Fishers selective silence would have been strictly marginal, not enough to have had reasonable possibility of contributing to the verdict. See Santos-Vega, 299 Kan. at 27. Fisher is not entitled to reversal of his convictions on the basis of the Doyle error alone.
Prosecutorial Misconduct
Fisher next claims the prosecutor committed misconduct on several occasions during both phases of his closing argument.
We review such claims even when a contemporaneous objection was not made at trial. State v. Anderson, 294 Kan. 450, 461, 276 P.3d 200 (2012), cert. denied 133 S. Ct. 529 (2012). Our analysis has two steps. First, the court determines whether the prosecutor’s comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. If the comments were improper and constituted misconduct, the appellate court must determine whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. State v. Roeder, 300 Kan. 901, 932-33, 336 P.3d 831 (2014), cert. denied 135 S. Ct. 2316 (2015). In the second step, we consider three factors: (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor’s part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. State v. Williams, 299 Kan. 509, 540, 324 P.3d 1078 (2014). None of these factors is individually controlling. Before the third factor can ever override the first two factors, we must be able to say that the harmlessness tests of both K.S.A. 60-261 and Chapman v. California, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. Williams, 299 Kan. at 540-41. As a practical matter, however, if the constitutional harmless error test is met, the statutory test also will be met. See State v. Lowrance, 298 Kan. 274, 282, 312 P.3d 328 (2013) (when State meets constitutional harmlessness test it necessarily also meets lower statutory harmlessness test as well). Under the constitutional test, the party benefit,ting from the error must demonstrate beyond a reasonable doubt that the error *252 did not affect the outcome of the trial in light of the entire record, i.e., there is no reasonable possibility that the error contributed to the verdict. 299 Kan. at 541.
During closing argument, the prosecutor must confine his or her remarks to matters in evidence. State v. Carr, 300 Kan. 1, 249, 331 P.3d 544 (2014). And the prosecutors comments must “accurately reflect the evidence, accurately state the law, and . . . not [be] intended to inflame the jury’s passions or prejudices or divert the jury from its duty to decide the case based on the evidence and controlling law.” 300 Kan. at 249. The prosecutor has “‘considerable latitude in discussing the evidence and drawing reasonable inferences from that evidence.’” State v. Tahah, 302 Kan. 783, 788, 358 P.3d 819 (2015).
Fisher first focuses on what he argues was an expression of the prosecutor’s opinion on Fisher’s guilt:
“You can’t even tell it’s a woman anymore, but he wants you to believe it’s self-defense. Whatever triggered it, whatever caused him to decide enough was enough with that woman, he took advantage of that and he beat her and beat her with the intent to ldll her.”
And, in rebuttal, the prosecutor said:
“State will continue to assert self-defense isn’t worth the response. He intentionally, for whatever reason, whatever it was that triggered in his mind over his bro, Tim, intentionally was going to Mil Angel Worthen. He meant to do it.”
A prosecutor may not express a personal opinion about tire defendant’s guilt because “‘such expressions of personal opinion are a form of unsworn, unchecked testimony, not commentary on the evidence of tire case. [Citation omitted.]’” State v. Mireles, 297 Kan. 339, 368, 301 P.3d 677 (2013). But a prosecutor may comment on the weakness of a defense or make a directional statement encouraging the jury to examine evidence of guilt. See State v. Peppers, 294 Kan. 377, 399-400, 276 P.3d 148 (2012); State v. Duong, 292 Kan. 824, 833, 257 P.3d 309 (2011) (pointing out weaknesses of defense theory not misconduct). “[A]n affirmative statement. . . not couched in terms such as ‘it is alleged’ or ‘the State intends to prove’ . . . stated as a fact. . . [is] the equivalent of a personal expression of guilt.” State v. Brown, 295 Kan. 181, 212, 284 P.3d 977 (2012).
*253 On the first of these two challenged statements, just before tire prosecutor remarked on Fishers intent to kill Angel, he had directed the jury to evidence supporting the State s version of events. The prosecutor had referred to Fishers size, the first responders initial impression that Angel was dead, and the amount of blood at the scene. The prosecutor then suggested how the fight may have occurred and concluded: “Whatever triggered it, whatever caused him to decide enough was enough... he beat her and beat her with tire intent” to Ml her. The prosecutor then said that there was “no way in this world the State will assert to you anything but that he intentionally attempted to kill Angel.” When we consider this first challenged statement in context, we conclude that it was part of a permissible summary of part of the evidence contradicting Fisher’s claim of self-defense and was not error.
Turning to the challenged statement from rebuttal closing, the prosecutor again argued, “He intentionally, for whatever reason, whatever it was that triggered in his mind over his bro, Tim, intentionally was going to Ml Angel Worthen. He meant to do it.” The State suggests that these comments were proper comment on the incredibility of Fishers claim of self-defense. Again, when the remarks are considered in context, we see no error. State v. Chanthaseng, 293 Kan. 140, 148, 261 P.3d 889 (2011) (die context in which prosecutor makes a statement is “all-important”).
Fisher next argues that the prosecutor committed misconduct by accusing him of lying. A prosecutor is also forbidden from accusing a defendant of lying. See State v. Brown, 300 Kan. 542, 560, 331 P.3d 781 (2014). And
“[t]he prohibition extends not only to using the word ‘lie’ but also to its ‘derivative.’ See State v. Elnicki, 279 Kan. 47, 62, 105 P.3d 1222 (2005) (prosecutor called defendant’s testimony a ‘fabrication,’ ‘yam,’ ‘final yarn,’ tire yarn spun here,’ and four-part yam’); see also [State v.] Akins, 298 Kan. [592,] 607, 315 P.3d 868 [2014] (prosecutor asked did the jury ‘buy’ defendant’s story and said his testimony was ‘not credible’).” Brown, 300 Kan. at 560.
During rebuttal closing, die prosecutor said:
“The State put [on] every bit of evidence it had and most of that came from that man, himseíf, whether it was in the hospital or his assertion today that somehow it was self-defense. Plow self-serving. How self-serving.
*254 . . Well, lets take his theory, it was with an elbow, of course they weren’t on his hands. He beat tire living heck out of her with his elbow. Pick one. Pick self-defense. His super attack from behind that was going to result, in his belief, in imminent death or great bodily harm? Bull.”
Although the prosecutor’s use of “self-serving” to describe Fisher’s testimony qualified was proper comment on inconsistencies in Fisher’s testimony, the prosecutor’s truncated slang exclamation of “bull” was beyond fire wide latitude allowed him in discussing the evidence. There is no mistaking the meaning of the expression; it is the equivalent of calling Fisher a liar. And “a prosecutor’s time during closing arguments is better spent discussing the evidentiary strengths of the case at hand, rather than devising different ways to euphemistically accuse a criminal defendant of lying on the witness stand.” Brown, 300 Kan. at 561.
Fisher also alleges misconduct in the form of remarks designed to inflame the passions of the jury. During the opening portion of the State’s closing, the prosecutor said: “[I]f you believe it’s self-defense, it doesn’t apply because it’s excessive. He had her loosened. He had her away from him. And then he beats the living hell out of her and kills her — about kills her.” This colloquialism resurfaced in somewhat milder form during rebuttal closing: “He beat the living heck out of her.”
A prosecutor may not encourage the juiy to decide a case based on a personal interest instead of neutrality or distract the jury from its duty to make decisions based on the evidence and the controlling law. See. State v. Corbett, 281 Kan. 294, 313, 130 P.3d 1179 (2006). But a-prosecutor may use “picturesque speech’ as long as he or she does not refer to facts not disclosed by the evidence.” State v. Crawford, 300 Kan. 740, 748-49, 334 P.3d 311 (2014).
The prosecutor’s use of “living hell” and “living heck” certainly made for “vivid descriptions” in his review of the evidence. See State v. McCaslin, 291 Kan. 697, 723, 245 P.3d 1030 (2011), overruled on other grounds in State v. Astorga, 299 Kan. 395, 324 P.3d 1046 (2014). And Fisher believes they crossed the line to repugnant and unprofessional. We disagree. There was no dispute that Fisher beat Angel almost to death; indeed, she suffered life-threatening injuries and was unrecognizable as a woman, or even alive, when *255 discovered. Although a prosecutor probably would be well advised to avoid expressions during arguments that could offend a jurors moral or religious sensibility, we do not think this prosecutor was trying to distract the juiy from deciding the case based on the evidence. Instead, he was emphasizing the severity of the beating and the likelihood that it went far beyond the violence that would have been necessary to effectively repel an attack. See Carr, 300 Kan. at 249 (“The wide latitude permitted a prosecutor in discussing the evidence during closing argument in a criminal case includes at least limited room for rhetoric and persuasion, even for eloquence and modest spectacle.”).
Having held that there was one instance of prosecutorial misconduct during closing, we move to the question of harmlessness.
First, we consider whether the misconduct was gross and flagrant. “Comments generally amount to gross and flagrant misconduct when they were repeated, emphasized, calculated, or in violation of well-established laws.” State v. Barber, 302 Kan. 367, 380, 353 P.3d 1108 (2015). The prosecutors use of the word “bull” to describe Fisher’s story at trial violated our longstanding rule against a prosecutors personal commentary on witness credibility, and this is fairly described as gross and flagrant. See Brown, 300 Kan. at 561.
Next, “[i]n analyzing ill will, this court considers whether the comments were 'deliberate or in apparent indifference to a court’s ruling.’” Barber, 302 Kan. at 380. There was no specific court ruling in this case that the prosecutor violated, and we do not perceive that the one-time, one-word remark was the product of ill will.
The third factor we consider in determining whether the prosecutor’s remark was reversible error, standing alone, is whether the evidence against Fisher was so direct and overwhelming that the misconduct would have had little weight in the minds of jurors. State v. Williams, 299 Kan. 509, 540, 324 P.3d 1078 (2014). We are convinced that the prosecutor s momentary lapse had negligible, if any impact, on Fisher’s jury.
Considering our three harmlessness criteria under the more demanding federal constitutional standard, the State' has demonstrated beyond a reasonable doubt that the single error did not af- *256 feet the outcome of the trial in light of the entire record; there is no reasonable possibility that the brief, unrepeated error contributed to the verdict. See Williams, 299 Kan. at 541.
Preliminary Instruction
Fishers next argument on this appeal focuses on the district judge’s instruction at the start of trial that their misconduct could result in a mistrial, which would be “a tremendous expense and inconvenience to the parties, the Court, and the taxpayers.” Fisher, whose counsel did not object below, urges this court to hold that this language was clear error necessitating reversal.
This precise issue was considered in our recent Tahah opinion. 302 Kan. at 792-95.
In that case, the district judge used nearly identical language at the opening of a trial to warn jurors about the consequences of their misbehavior. 302 Kan. at 792. The defendant challenged the instruction on appeal, suggesting that it violated the rule of States v. Salts, 288 Kan. 263, 266-67, 200 P.3d 464 (2009), in which this court held that an Allen instruction given at the beginning of deliberations that said “ ‘another trial would be a burden on both sides’ ” was misleading and inaccurate.
In Tahah, we declined to extend the Salts holding. We distinguished a preliminary jury instruction given in the context of explaining the danger of juror misconduct from a true Allen instruction, which is impermissible because it could coerce jurors into a “unanimous verdict by unduly influencing [them] to compromise their views on the evidence simply to avoid a hung jury.” Tahah, 302 Kan. at 794-95. We held that the preliminary instruction given in Tahah was not error. 302 Kan. at 795. That holding is controlling here, and Fisher’s challenge to the preliminary instruction fails.
Lesser Included Offense Instruction
Fisher also challenges the district judge’s failure to give a lesser included offense instruction on attempted voluntary manslaughter based on a theory of imperfect self-defense.
Our analysis of jury instruction challenges follows this pattern:
“‘(1) First, the appellate court should consider the reviewability of the issue from *257 both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the fight most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in State v. Ward, 292 Kan. 541, 256 P.3d 801 (2011), cert. denied 132 S. Ct. 1594 (2012).”’ State v. Woods, 301 Kan. 852, 876, 348 P.3d 583 (2015).
When, as here, the failure to give a lesser included offense instruction is challenged on appeal, the court applies the same analytical framework. State v. Armstrong, 299 Kan. 405, 432, 324 P.3d 1052 (2014).
According to the record before us, Fisher did not seek an instruction on attempted voluntary manslaughter or object to its omission. His silence on this issue at the time of trial does not deprive us of jurisdiction to consider it. See K.S.A. 2015 Supp. 22-3414(3); State v. Waggoner, 297 Kan. 94, 97, 298 P.3d 333 (2013) (“[Fjailure to object to an instruction does not prevent appellate review.”). But, as further discussed below, it means he would face a higher burden in persuading us that any error merits reversal. See State v. Williams, 295 Kan. 506, 511-12, 286 P.3d 195 (2012) (noting exception to K.S.A. 2015 Supp. 22-3414[3]; the preservation requirement allows appellate court to consider clear error).
Turning to whether an attempted voluntary manslaughter instruction would have been legally appropriate, voluntary manslaughter is a lesser included offense of second-degree murder. Therefore, an attempted voluntary manslaughter instruction would have been legally appropriate in this prosecution for attempted second-degree murder. See State v. Salary, 301 Kan. 586, 599, 343 P.3d 1165 (2015).
The question of whether the instruction would have been factually appropriate is more difficult. See State v. Molina, 299 Kan. 651, 661, 325 P.3d1142 (2014) (failure to instruct on lesser included crime erroneous only if instruction would have been factually appropriate). “‘[Wjhere there is some evidence which would reasonably justify a conviction of some lesser included crime . . ., the judge shall instruct the jury as to the crime charged and any lesser *258 included crime.’” Armstrong, 299 Kan. at 432 (quoting K.S.A. 2015 Supp. 22-3414[3]); see also State v. Story, 300 Kan. 702, 710, 334 P.3d 297 (2014) (evidence must reasonably justify conviction of lesser included crime). If, after a review of all the evidence viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty of the lesser crime, failure to give the instruction is error. Armstrong, 299 Kan. at 433.
Voluntary manslaughter based on imperfect self-defense is “knowingly killing a human being committed . . . upon an unreasonable but honest belief that circumstances existed that justified use of deadly force under K.S.A. 2015 Supp. 21-5222.” K.S.A. 2015 Supp. 21-5404(a)(2). Under K.S.A. 2015 Supp. 21-5222(a), “[a] person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person . .. against such other’s imminent use of unlawful force.” The imperfection in “imperfect self-defense” is objective unreasonableness of the defendant’s subjective belief in the necessity of violence.
This means that, in order to determine that an attempted voluntary manslaughter instruction was factually appropriate, we must detect record evidence to support die existence of Fisher’s subjective, honest belief that force was necessary to defend himself against Angel, as well as evidence demonstrating that Fisher’s belief was objectively unreasonable. See State v. Qualls, 297 Kan. 61, 70-71, 298 P.3d 311 (2013); State v. Gonzalez, 282 Kan. 73, 110, 145 P.3d 18 (2006). This court does not speculate about hypothetical scenarios. Story, 300 Kan. at 710 (quoting State v. Wade, 295 Kan. 916, 925, 287 P.3d 237 [2012]).
This case is relatively unusual. A typical stumbling block for a defendant who desires an instruction on voluntary manslaughter based on imperfect self-defense is a lack of evidence of a subjective belief in the necessity of self-defense. See Gonzalez, 282 Kan. at 111-12 (listing cases); see also State v. Moore, 287 Kan. 121, 194 P.3d 121 (2008) (voluntary manslaughter instruction not appropriate in shooting death of police officer; defendant knew individuals at door were law enforcement officers, understood why they were *259 there); State v. White, 284 Kan. 333, 161 P.3d 208 (2007) (no entitlement to voluntary manslaughter instruction when no evidence defendant believed grandson in imminent danger). Here, we have ample evidence of Fishers subjective belief. He testified that Angel initiated the attack and that he drought she was going to kill him. He thought Stevens and Angel had harmed Tim and were trying to prevent him from helping Tim. He testified that Angel had told him in the past that she had received training in hand-to-hand combat while in the Navy, and Tim confirmed that Angel had said she could handle herself in a fight.
The greater potential stumbling block in this case is the paucity of evidence that Fishers subjective belief was objectively unreasonable and yet not delusional. See State v. Ordway, 261 Kan. 776, 790, 934 P.2d 94 (1997) (honest but unreasonable belief cannot be product of psychosis). No one saw or heard the beginning of the fight between Fisher and Angel; and Angels memory of the event was so impaired that she could not contest Fishers version. Tim did testify that he heard Stevens yell out the window that she would not let him go, which generally supports Fishers expressed fear for Tims safety. And one of the first responders testified about Fisher having defensive wounds, which tends to support Fishers stoiy that Angel, with her militaiy combat training, was on offense at some point in their fight. This evidence reads “reasonable” rather than “unreasonable.”
Still, Fishers version of events also contained elements of the bizarre, including the possibility of government conspiracy and one or more marauding assassins. And Fisher was undoubtedly extremely intoxicated. After being stopped by police twice on his walk home, he fought with Tim on arrival, then promptly forgot he had seen him at all, developing an alternate theory that Tim had been kidnapped and was being confined and concealed against his will by Stevens and Angel:
Even viewing the whole of the evidence in the light most favorable to the prosecutor, we conclude that a rational factfinder could have found Fisher guilty of attempted voluntary manslaughter based on imperfect self-defense. See Armstrong, 299 Kan. at 433. Although this is a close case, under current Kansas caselaw, the instruction was factually appropriate.
*260 Having determined the omitted attempted voluntary manslaughter instruction was legally and factually appropriate, we hold there was error under K.S.A. 2015 Supp. 22-3414(3). However, because Fisher lodged no timely objection to the omission of the instruction, he is entitled to reversal only if we hold the omission was clearly erroneous. We consider the entire record de novo, including procedural safeguards and the total amount of inculpatory evidence. State v. Briseno, 299 Kan. 877, 886, 326 P.3d 1074 (2014); Armstrong, 299 Kan. at 433. We reverse only if firmly convinced that the jury’s verdict Would have been different had the district judge given the missing instruction, and Fisher bears the burden of demonstrating that this case meets that demanding standard. See State v. Littlejohn, 298 Kan. 632, 646, 316 P.3d 136 (2014).
Fisher does not carry his burden here. Under appropriate facts a juiy may consider intentional second-degree murder and voluntary manslaughter based on a theoiy of imperfect self-defense simultaneously. See State v. Carter, 284 Kan. 312, 326, 160 P.3d 457 (2007). And, had the jury been properly instructed here, there is a theoretical possibility it could have rendered a different verdict because imperfect self-defense fit some of the admitted evidence. But, a mere theoretical possibility is inadequate under the clear error standard. The whole of the evidence includes Fishers admission to hitting Angel and threatening to kill her if she did not reveal Tim’s whereabouts. In view of this statement, Fisher cannot show the verdict would have been different if the juiy was instructed on attempted voluntary manslaughter.
Sufficiency of Evidence of Criminal Damage
Fisher also challenges the sufficiency of the evidence supporting his conviction for criminal damage to property. When the sufficiency of the evidence is challenged in a.criminal case, an appellate court reviews all the evidence in the light most favorable to the State. A conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. Williams, 299 Kan. 509, 525, 324 P.3d 1078 (2014). To the extent Fisher’s argument requires us to interpret the language of the criminal damage statute, *261 we examine that question of law de novo. State v. Eddy, 299 Kan. 29, 32, 321 P.3d 12 (2014).
K.S.A. 2015 Supp. 21-5813(a)(l) defines criminal damage to property as, by means other than fire or explosives, knowingly causing damage to property “in which another has an interest.” Fisher specifically argues that insufficient evidence was presented to establish that Angel had “an interest” in the door he damaged. He asks this court to interpret “an interest” as used in the statute to refer to a “property interest,” because otherwise an owner of a home could be guilty of criminal damage for kicking in his or her own door as long as another person also had “an interest” in the door. The State suggests that Angel had a leasehold interest in the property.
Blacks Law Dictionary 828 (8th ed. 2004) defines “interest” as “a legal share in something; all or part of a legal or equitable claim to or right in property.” A “legal interest” is defined as “[a]n interest recognized by law.” Blacks Law Dictionary 829 (8th ed. 2004). A “leasehold interest” is “[a] lessors or lessees interest under a lease contract.” Black’s Law Dictionary 910 (8th ed. 2004).
The Court of Appeals has addressed what constitutes “an interest” in property in this context, holding that a pastor who served as an administrator and caretaker for a church had “an interest” in it, that a joint owner could be criminally fiable for damage to it, and that both an individual renting a townhome and the entity owning it had “an interest” in it. In re D.A., 40 Kan. App. 2d 878, 882-83, 197 P.3d 849 (2008) (pastor); see State v. Wilson, 47 Kan. App. 2d 1, 4-5, 275 P.3d 51 (2008) (joint owner); see also State v. McGowan, No. 107,147, 2012 WL 3136771 (Kan. App. 2012) (unpublished opinion) (individual renting, entity owning).
We have not directly addressed this statute, but recently in State v. Bollinger, 302 Kan. 309, 313, 352 P.3d 1003 (2015), we considered what constitutes “an interest” under our arson statute. The primary distinction between the criminal damage to property provision and the arson provision is the means by which property is damaged. K.S.A. 2015 Supp. 21-5812, the arson statute, forbids an individual from knowingly by means of fire or explosives damaging a dwelling “in which another person has any interest.” (Emphasis added.)
*262 We held that when the interest is not contested, the State “is not required to establish exactly what the nature of the ‘any interest’ is, be it a fee simple, a rental, or a tenancy, in order to satisfy the statutory requirement. [Citation omitted.]” 302 Kan. at 314. But when “the interest is contested at trial, it may be incumbent upon the State to establish the nature” of the interest. State v. Boone, 277 Kan. 208, 215, 83 P.3d 195 (2004), abrogated on other grounds as recognized in State v. De La Torre, 300 Kan. 591, 601, 331 P.3d 815 (2014). In Bollinger, the wife had an interest “derived both from the legal rights inherent in a marital relationship and the special circumstances of this case,” including a court order granting her exclusive possession of the house. 302 Kan. at 315.
Other jurisdictions also have considered what type of interest another person must have in property in order to sustain a defendant’s conviction for conduct similar to Fisher’s and have determined that either a possessory or a proprietaiy interest in the property is sufficient. See State v. Brushwood, 171 S.W.3d 143, 147 (Mo. App. 2005); People v. Kheyfets, 174 Misc. 2d 516, 518, 665 N.Y.S.2d 802 (Sup. Ct. 1997).
In this case, the only evidence, was that Angel lived at the home containing the damaged door. There was no evidence of a lease or of her payment of rent. Nevertheless, we hold that Angel had “an interest” in Tim’s home as one of its residents. The legislature could have been more specific had it wanted to limit the reach of K.S.A. 2015 Supp. 21-5813(a)(1). See Com. v. One 1988 Suzuki Samurai, 139 Pa. Commw. 68, 73, 589 A.2d 770 (1991) (possession, exercise of dominion, control over property elements in determining ownership); see also K.S.A. 2015 Supp. 21-5801 (defining theft as taking property from “owner”). Until it says differently, we will include a residential interest such as Angel’s among the group covered by “an interest” in the statute.
Cumulative Error
Fisher’s final appellate challenge to his convictions alleges cumulative error.
‘“Cumulative error, considered collectively, may be so great as to require reversal of a defendant’s conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or *263 her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. State v. Dixon, 289 Kan. 46, 71, 209 P.3d 675 (2009).’ State v. Hart, 297 Kan. 494, 513-14, 301 P.3d 1279 (2013).
‘“In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless.’ State v. Tully, 293 Kan. 176, 205, 262 P.3d 314 (2011).
“‘In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); tire nature and number of errors committed and their interrelationship, if any; and the strength of the evidence.’ 293 Kan. at 205-06.
“ ‘ “The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial.”’ State v. Magallanez, 290 Kan. 906, 926, 235 P.3d 460 (2010).” State v. Smith-Parker, 301 Kan. 132, 167-68, 340 P.3d 485 (2014).
We have identified three errors; the Doyle violation, the prosecutors reference to Fishers testimony as “bull,” and the failure to instruct on the lesser included offense of attempted voluntary manslaughter. None was reversible standing alone.
Given the evidence against Fisher, particularly including his admission on the night he beat Angel, the permissible impeachment of his more exculpatory trial testimony, and the severity of Angel’s injuries, even when the three errors are considered together under the cumulative error doctrine, they do not necessitate reversal. Fisher was not entitled to a perfect trial, and he received a fair one. See State v. Todd, 299 Kan. 263, 286-87, 323 P.3d 829 (2014).
Classification of Preguidelines Convictions
Fisher argues his sentence was illegal because of the way in which the district judge classified his prior convictions. Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which the appellate court has unlimited review. State v. Taylor, 299 Kan. 5, 8, 319 P.3d 1256 (2014). Appellate courts “unquestionably may entertain” a defendants claim on an illegal sentence for the first time on appeal because,
*264 “Kansas courts have ‘specific statutoiy jurisdiction to correct an illegal sentence at any time.’ State v. Scherzer, 254 Kan. 926, 930, 869 P.2d 729 (1994) (citing K.S.A. 22-3504; see also State v. Rogers, 297 Kan. 83, 93, 298 P.3d 325 (2013) (‘This court may correct an illegal sentence sua sponte.’)." State v. Kelly, 298 Kan. 965, 975-76, 318 P.3d 987 (2014).
After Fisher had filed his brief before the Court of Appeals, this court issued its opinion in State v. Murdock, 299 Kan. 312, 323 P.3d 846 (2014), modified by Supreme Court order September 19, 2014, which supported Fishers claim. Kansas Supreme Court Rule 6.09(b) (2015 Kan. Ct. R. Annot. 54) allows a party to notify the court by letter of additional authority “that has come to the party’s attention after the party’s last brief was filed.” But generally “an appellate court will not consider new issues raised for the first time in a party’s Rule 6.09(b) letter,” Littlejohn, 298 Kan. at 659 (letter raised previously unraised argument, not new argument based on new authority). And the Court of Appeals declined to consider Fisher’s challenge to the legality of his sentence. Because Kansas courts are empowered to consider a motion to correct an illegal sentence for the first time on appeal, the panel should have considered the merits of Fisher’s issue. See Kelly, 298 Kan. at 975-76.
All of this being said, this court has since overruled Murdock in State v. Keel, 302 Kan. 560, 589, 357 P.3d 251 (2015), and Fisher’s illegal sentence claim therefore fails.
Sentencing Based on Criminal History
Fisher also challenges his sentence under the Sixth and Fourteenth Amendments to the United States Constitution, arguing that the district judge could not use his prior convictions to enhance his sentence without ensuring that the existence of those convictions was proved to a jury beyond a reasonable doubt. Fisher relies on Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Fisher recognizes that this court conclusively rejected this argument in State v. Ivory, 273 Kan. 44, 45-48, 41 P.3d 781 (2002), and includes the issue only to preserve it for federal review. No further discussion of the issue is warranted.
*265 Conclusion
Defendant Matthew T. Fisher has not persuaded this court that his convictions of attempted second-degree murder and criminal damage to property were infected by reversible error. Nor was his sentence illegal. The judgment of the district court is affirmed.
⅞ * ⅜