NOT DESIGNATED FOR PUBLICATION

No. 117,814

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANIEL R. HUFFMAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JOHN J. KISNER JR., judge. Opinion filed December 14, 2018. Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Boyd K. Isherwood*, assistant district attorney, *Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., ATCHESON and POWELL, JJ.

PER CURIAM: After a jury convicted Daniel R. Huffman of aggravated battery with a deadly weapon by a jury of his peers, the district court sentenced Huffman to 31 months in prison and ordered him to register as a violent offender under the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq. On appeal, Huffman argues the district court erred by (1) giving an aiding and abetting jury instruction, (2) providing a verdict form to the jury that failed to properly instruct the jury on Huffman's presumption of innocence, and (3) instructing Huffman to register as a violent offender.

1

After a review of the record, we find no reversible error on the part of the district court and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Steven Williams and Michael White were arrested and booked into the Sedgwick County jail on August 29, 2015. During the time Williams was in jail, he began to hear rumors that people were under the impression that he "snitched" on White regarding the offense for which they were arrested. Williams heard that Huffman, whose street name was "Skrappy," was purportedly one of the individuals fueling the rumor.

On October 5, 2015, Williams was released to probation with drug court. Two days after his release, Williams decided to speak with a friend in an effort to glean more information regarding the rumors circulating that he was a snitch. Williams arrived at his friend's residence via bicycle around 11 p.m., and he observed a group of approximately 8 to 12 individuals standing by the garage. Williams recognized Huffman standing shirtless within the group; he recognized Huffman from the tattoos on his face, as well as the "Skrappy" tattoo on his abdomen.

Williams approached the group and identified himself by his street name "Pinky." He heard a baton flick open at the mention of his name, so he turned and started to run. Approximately five to six members of the group gave chase to Williams, called him a snitch, and struck him in the back of the head with an object as he ran. A second blow to the head knocked Williams to the ground, but he got back up and continued running. Williams was struck a third time by an object that hit him in the face. This blow sent Williams to the ground again, and the group descended upon him, punching and kicking him in the head and stomach. Moments later, Williams saw the muzzle flash of a gun and heard someone say "snitch bitch" as a bullet struck Williams' left calf. Despite the time of day, Williams discerned that Huffman was the shooter given his position as the sole

2

attacker near Williams' feet—the others in the group were by this head—the shape of Huffman's body, and his voice.

Charles Pegg lived in a nearby house and emerged to investigate moments after hearing a gunshot. Pegg helped Williams walk back to Pegg's residence and tied a tourniquet around his leg to slow the bleeding. Pegg testified Williams told him "some fool named Skrappy" shot him. Pegg asked his girlfriend to call 911. EMS transported Williams to the hospital, and en route, Williams told a law enforcement officer riding in the ambulance that Huffman was responsible for the shooting. Williams testified he initially was reluctant to tell law enforcement officers who shot him, although he later decided to indicate that he believed Huffman shot him.

Williams was admitted to the hospital and spent two days recovering from his injuries sustained during the beating and shooting. Williams was treated for the gunshot wound and needed six to nine stiches to close a gash in his forehead. Two detectives interviewed Williams at the hospital, and the day after that interview Huffman was arrested for the shooting.

The State charged Huffman with aggravated battery, criminal possession of a firearm, and possession of drug paraphernalia. The case proceeded to trial only on the aggravated battery charge, a severity level 7 person felony, see K.S.A. 2017 Supp. 21-5413(b)(1)(B), and a jury convicted him. Based on Huffman's criminal history score of B, the district court sentenced Huffman to 31 months' imprisonment and notified him of his duty to register as a violent offender under KORA.

Huffman timely appeals.

I.    DID THE DISTRICT COURT ERR IN GIVING AN AIDING AND ABETTING JURY INSTRUCTION?

Huffman first argues that the district court erred when it gave a factually and legally inappropriate aiding and abetting jury instruction. The State requested and the district court gave the following jury instruction:

"A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime or advises, hires, counsels, [or] procures another to commit the crime.

"The person is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the person could reasonably foresee the other crime as a probable consequence of committing or attempting to commit the intended crime."

When reviewing a jury instruction, we use a four-step process:

"'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221.' [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

4

A.      *Preservation*

Under the first step of our inquiry, whether Huffman properly preserved his objection to the district court's aiding and abetting instruction is subject to unlimited review. See 304 Kan. at 256-57. Whether a party has preserved a jury instruction issue affects our reversibility inquiry. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Huffman did not object to the instruction on the basis that it was legally inappropriate. If we determine the aiding and abetting instruction was legally inappropriate, any error on that basis will be reviewed for clear error, which means we will reverse only if we are firmly convinced that the jury would have reached a different verdict if the instruction error had not occurred. Huffman bears the burden of showing clear error. See 307 Kan. at 318. Huffman did object to the factual basis for the aiding and abetting jury instruction and has properly preserved that specific issue for appellate review. Accordingly, if we determine that the instruction was factually erroneous, the error requires reversal if we find there is a reasonable probability that the error affected the outcome. See *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016).

B.      *Legal Appropriateness*

For a jury instruction to be legally appropriate, it "'must always fairly and accurately state the applicable law.' [Citation omitted.]" *State v. Kleypas*, 305 Kan. 224, 302, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017). This review is unlimited. *Fisher*, 304 Kan. at 257.

Huffman makes three specific arguments in support of his assertion that the aiding and abetting jury instruction was legally inappropriate. First, he argues the instruction did not properly explain the law. Second, he argues the instruction did not define "intentionally," the intent required to find someone guilty as an aider and abetter. Third,

5

he argues the instruction did not make clear that Huffman's culpability for "a crime" and "any other crime" was not a general responsibility.

1. *Did the instruction properly explain the law?*

Huffman argues that the aiding and abetting jury instruction did not explain the law because it omitted part of the appropriate PIK instruction. The omitted portion of the PIK instruction reads:

> "All participants in a crime are equally responsible without regard to the extent of their participation. However, mere association with another person who actually commits the crime or mere presence in the vicinity of the crime is insufficient to make a person criminally responsible for the crime." PIK Crim. 4th 52.140 (2016 Supp.).

The Kansas Supreme Court has encouraged district courts to use PIK language in aiding and abetting jury instructions. However, the court also held that failing to include the language "may not constitute error if . . . the instructions properly and fairly state the law as applied to the facts of the case." *State v. Llamas*, 298 Kan. 246, 261-62, 311 P.3d 399 (2013).

Huffman's reliance on *Llamas* here is misplaced. The recommendation by the *Llamas* court was intended for those cases where the defendant's defense was based on the theory that he or she was merely present during the commission of the crime and did not actively aid the crime. 298 Kan. at 261. That is not the case here. Huffman's defense at trial was that he was not present, he was not involved, and he was intentionally misidentified by Williams as one of the attackers for sinister reasons.

The evidence at trial was subject to interpretation by the jury that if Huffman was not the shooter he was nonetheless guilty for the role he played in assisting another to

6

commit that offense. Williams identified Huffman not only as the shooter but also as a member of the group who attacked him. Accordingly, even with the omission of the third PIK paragraph, the jury instruction given properly explained the law.

2.    *Was a definition of "intentionally" required?*

Next, Huffman argues that the instruction was legally inappropriate because the district court took measures to define "knowingly" in the aggravated battery jury instructions but it did not undertake measures to define "intentionally" in the aiding and abetting jury instruction.

In *Llamas*, the defendant requested the same PIK language that was omitted here, and the district court ultimately did not include that language in the jury instructions. Our Supreme Court held that the exclusion was not error and that a district court may properly refuse to add "'mere presence or association' language because the pattern instruction 'clearly informs the jury that intentional acts by a defendant are necessary to sustain a conviction for aiding and abetting.'" 298 Kan. at 260; see PIK Crim. 4th 52.140, Notes on Use; see also *State v. Edwards*, 291 Kan. 532, 552, 243 P.3d 683 (2010) ("[W]e decline to find that the district court's refusal to add the requested language to the patterned instruction on aiding and abetting was reversible error."); *State v. Pink*, 270 Kan. 728, 739, 20 P.3d 31 (2001) ("It is well established . . . that the refusal of the trial court to give an additional instruction on mere association is not erroneous."), *overruled on other grounds by State v. Gleason*, 277 Kan. 624, 88 P.3d 218 (2004).

Our conclusion that Huffman's argument is meritless is also supported by the difference between the defense raised by Llamas—that he was merely present during the commission of the crime— and Huffman's defense that he was never present. Such a defense makes the omission of the "mere presence or association" language legally

7

appropriate. The district court's aiding and abetting jury instruction as given was not legally erroneous.

 3. *Did the jury instruction confuse the jury when Huffman was only charged with one crime related to the shooting?*

Finally, Huffman argues that part of the aiding and abetting jury instruction given created confusion for the jury because the crime of aggravated battery relied upon by the State was the shooting, not the beating that preceded it, so there was not any "other crime" committed and, therefore, nothing to "reasonably foresee." Huffman complains about the following portion of the given instruction:

 "The person is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the person could reasonably foresee the other crime as a probable consequence of committing or attempting to commit the intended crime."

Huffman's argument seems to assert that such language necessitates that two crimes be charged, yet he cites no support for this assertion. Although not directly on point, in *State v. Francis*, 282 Kan. 120, 146, 145 P.3d 48 (2006), the Kansas Supreme Court held that the given aiding and abetting instruction was proper based on the facts in that case. There, Francis was an occupant in a vehicle with several others when it pulled alongside another vehicle in which the victim was riding. Francis was in the front passenger side of the vehicle, and several arms were outside of the vehicle. At least five different guns were fired at the vehicle the victim was in, killing the victim. The Supreme Court held that Francis was in a position to shoot at the victim's vehicle and from the evidence it reasonably could have been inferred that several persons shot at the vehicle. 282 Kan. at 144. Importantly, Francis was convicted under the theory of aiding and abetting where only a single crime was charged—first-degree murder. He was not

8

charged with any other offenses related to firing at the occupied vehicle. Similarly, here, Huffman was only charged with one crime pertaining to Williams' injuries—aggravated battery. His other two charges, possession of a firearm and possession of drug paraphernalia, were unrelated to the aggravated battery.

Finally, the language in the instruction that Huffman argues is problematic pertains to the "intended crime," not the *charged* crime. When the group set out after Williams with weapons and struck him multiple times, the group intended to commit a crime. The State merely opted to pursue charges only relating to the shooting, not to other criminal acts that may have occurred that evening. This portion of the jury instruction was not given in error.

The jury instructions as a whole fairly and accurately state the law as applied to Huffman's case. Accordingly, the aiding and abetting jury instruction was legally appropriate.

C.    *Factual Appropriateness*

Next, we must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would support the instruction. *Fisher*, 304 Kan. at 257. Here, the State requested this instruction; therefore, we must determine if the aiding and abetting jury instruction was factually appropriate viewing the evidence presented in the light most favorable to the State.

Williams testified that on the night of the attack a group of five to six people chased him down. He only knew two members of the group, and Huffman was one of those two people. Williams testified that he was twice hit in the back of the head and that the third hit caused him to fall to the ground. After Williams fell, the group descended upon him, punching and kicking him. Huffman was positioned near Williams' feet, while

9

the other attackers were near his head. Williams heard Huffman say "snitch bitch" before firing a single shot into his leg. The group then immediately scattered.

On direct examination, Williams testified he was 100 percent sure Huffman had shot him. However, on cross-examination, Huffman's counsel elicited testimony from Williams that during the preliminary hearing he had testified he did not know who shot him, but Williams said he only testified as such in an effort to avoid sending Huffman to prison.

Pegg, the man who came to Williams' aid after the shooting, testified that when he asked Williams who shot him, Williams responded, "[S]ome fool named Skrappy." But on cross-examination, Pegg testified that on the night of the shooting he did not tell law enforcement officers that Williams had identified the shooter to him. In response to Huffman's counsel's questioning, Pegg also testified that prior to trial he sought lenience from the State in an unrelated criminal matter in exchange for his testimony in Huffman's case. Additionally, law enforcement officers testified that Williams was not initially forthcoming with details surrounding the shooting and, in particular, the shooter's identity.

Viewing this evidence in the light most favorable to the State, there are portions of the evidence that may cast doubt in the minds of the jury over Williams' assertion that Huffman was the shooter. Huffman's counsel sought to highlight those detractors in an effort to shift the focus away from Huffman. However, the fact remained that Williams was shot in the leg during the course of the attack that Huffman and others carried out against him. "'[T]o be guilty of aiding and abetting a defendant must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed.' *State v. Schriner*, 215 Kan. 86, 92, 523 P.2d 703 (1974)." *Llamas*, 298 Kan. at 253.

The State argues that under the standard of guilt via aiding and abetting set forth in *Llamas*, the jury instruction was factually appropriate. Yet, the given jury instruction did not contain the above principle. Rather, it stated:

"A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime or advises, hires, counsels, [or] procures another to commit the crime.

"The person is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the person could reasonably foresee the other crime as a probable consequence of committing or attempting to commit the intended crime."

Here, there was no evidence that Huffman advised, hired, counseled, or procured another to shoot Williams. However, the instruction also stated that Huffman was criminally responsible for the crime if he intentionally aided another in the commission of the crime. While

"mere association with a principal who actually commits a crime or mere presence in the vicinity of the crime is itself insufficient to establish guilt as an aider and abettor . . . , when a person knowingly associates with an unlawful venture and participates in a way that demonstrates willful furtherance of its success, guilt as an aider and abettor is established." *State v. Herron*, 286 Kan. 959, 968, 189 P.3d 1173 (2008).

Even if the jury found Huffman was not the shooter, Williams never wavered in his assertion that Huffman was a member of the group that chased him and beat him, and it was during this beating that Williams was shot in the leg while on the ground as a result of a blow to the head. Based on the evidence presented, Huffman, at the very least, was a member of the group that facilitated the shooting of Williams. As such, although parts of

11

the instruction lack factual appropriateness, in viewing the evidence in the light most favorable to the State, the instruction as a whole was factually appropriate.

Finding no legal or factual error in the district court's aiding and abetting jury instruction, we conclude the district court did not err in giving it.

II.    WAS HUFFMAN'S RIGHT TO BE PRESUMED INNOCENT VIOLATED?

Huffman argues that the district court violated his constitutional right to the presumption of innocence by placing the "guilty" blanks before the "not guilty" blank on the verdict form. The district court provided a verdict form that read:

"_____ We, the jury, find Daniel Huffman guilty of aggravated battery—great bodily harm/disfigurement

"_____ We, the jury, find Daniel Huffman guilty of aggravated battery—bodily harm with a deadly weapon

"_____ We, the jury, find Daniel Huffman not guilty of aggravated battery

"_____
"Presiding Juror
"Date _____"

The district court also provided two relevant jury instructions. Jury Instruction No. 2 read, in part:  "Your only concern in this case is determining if Daniel Huffman is guilty or not guilty. The disposition of the case is a matter for determination by the Court." Jury Instruction No. 6 read:

"The test you must use in determining whether Mr. Huffman is not guilty or guilty is this:  If you have a reasonable doubt as to the truth of any of the claims required

12

to be proved by the State, you must find Mr. Huffman not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find Mr. Huffman guilty."

"While a verdict form is not technically a jury instruction, it is part of the packet sent with the jury which includes the instructions and assists the jury in reaching its verdict. It is appropriate to apply the same standard of review applicable to the review of instructions." *Unruh v. Purina Mills*, 289 Kan. 1185, 1197-98, 221 P.3d 1130 (2009). Therefore, we apply a three-step analysis when analyzing a challenge to a verdict form by "(1) [d]etermining whether [we] can or should review the issue, i.e., whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits to determine whether error occurred; and (3) assessing whether the error requires reversal. [Citation omitted.]" *State v. McDaniel*, 306 Kan. 595, 614, 395 P.3d 429 (2017).

Here, Huffman's counsel did not object to the verdict form; rather, Huffman personally objected to the verdict form. At the conclusion of the jury instruction conference, Huffman spoke up and informally objected to the verdict form, expressing his discontent that the "guilty" options preceded the "not guilty" option. The district court noted that the form is suggested by the Pattern Instructions Kansas (PIK) and utilized the form quoted above.

The quandary for us is determining whether Huffman properly preserved this issue. While Huffman himself spoke up and objected to the verdict form, Huffman's counsel failed to object. A party has the right to represent himself or herself or to be represented by counsel, but he or she "does not have the right to a hybrid representation." *State v. Holmes*, 278 Kan. 603, 620, 102 P.3d 406 (2004); *State v. McKessor*, 246 Kan. 1, 12, 785 P.2d 1332 (1990). "The right to the assistance of counsel and the right of self-representation may be viewed as mutually exclusive rights. A criminal defendant does

13

not have an absolute right to both self-representation and the assistance of counsel. *United States v. Halbert*, 640 F.2d 1000, 1009 (9th Cir. 1981)." *Wahl v. State*, No. 114,888, 2017 WL 3668917, at *4 (Kan. App. 2017) (unpublished opinion), *rev. denied* 307 Kan. 994 (2018).

"[C]ertain decisions relating to the conduct of a criminal case are ultimately for the accused: (1) what plea to enter; (2) whether to waive a jury trial; and (3) whether to testify. . . . [A]ll other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his or her client." *Bledsoe v. State*, 283 Kan. 81, 92, 150 P.3d 868 (2007). Thus, decisions about jury instructions or verdict forms were to be made by Huffman's counsel. As Huffman has not pursued the course of self-representation and is not entitled to hybrid representation, Huffman's personal informal objection to the verdict form does not suffice to preserve the issue for appellate review. Therefore, we will use the clearly erroneous analysis in the third step of the review of this issue. See *Louis*, 305 Kan. at 457; K.S.A. 2017 Supp. 22-3414(3).

Considering the merits of Huffman's argument, our duty is to examine whether the verdict form was legally and factually appropriate under an unlimited standard of review of the entire record on appeal. See *McDaniel*, 306 Kan. at 614. Huffman argues only that the verdict form was legally inappropriate. "A legally inappropriate verdict form amounts to instructional error if both the verdict form and the instructions as a whole failed to fairly and accurately state the law of the defendant's presumption of innocence." *State v. Salas-Torres*, No. 116,581, 2017 WL 5180763, at *4 (Kan. App. 2017) (unpublished opinion) (citing *State v. Hilt*, 299 Kan. 176, 184-85, 322 P.3d 367 [2014]), *petition for rev. filed* December 11, 2017.

In *State v. Wesson*, 247 Kan. 639, 802 P.2d 574 (1990), *cert. denied* 501 U.S. 1236 (1991), *disapproved of on other grounds by State v. Rogers*, 282 Kan. 218, 144 P.3d 625 (2006), the Kansas Supreme Court addressed the issue now before us. In that case, the

14

court held that a verdict form placing "guilty" before "not guilty" did not violate the defendant's presumption of innocence. Specifically, and highly important here, the court reasoned that "[a] defendant is presumed innocent *and the jury is so instructed. The purpose of a trial is to determine if the accused is guilty.*" (Emphasis added.) 247 Kan. at 652. The Supreme Court held that no prejudice existed because any purported error in the verdict form was cured by a jury instruction that read: "'The State has the burden of proving the defendant is guilty. The defendant is not required to prove he is not guilty. You must assume the defendant is not guilty unless the evidence convinces you of the defendant's guilt.'" 247 Kan. at 652; see *State v. Wilkerson*, 278 Kan. 147, 159, 91 P.3d 1181 (2004) (following *Wesson*); *Salas-Torres*, 2017 WL 5180763, at *4 (same).

However, in both *Wesson* and *Salas-Torres*, the jury was instructed that the defendant was presumed innocent, which cured any alleged error caused by placing the "guilty" blanks before the "not guilty" blank on the verdict form. See *Wesson*, 247 Kan. at 652; *Salas-Torres*, 2017 WL 5180763, at *4. Here, a presumption of innocence instruction was not given to the jury along with the other instructions. In light of this failure, we asked the parties for supplemental briefing on this point.

The Sixth Amendment to the United States Constitution, made applicable to the states via the Fourteenth Amendment, guarantees a defendant the right to a fair trial, and "[t]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126, *reh. denied* 426 U.S. 954 (1976). However, "there is no constitutional requirement that the jury be instructed on the presumption of innocence. *Kentucky v. Whorton*, 441 U.S. 786, 788, 99 S. Ct. 2088, 60 L. Ed. 2d 640 [1979]; *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S. Ct. 1930, 56 L. Ed. 2d 468 [1978])." *State v. Clark*, 261 Kan. 460, 474, 931 P.2d 664 (1997). Moreover, the United States Supreme Court has held that the failure to give a presumption of innocence instruction does not, in and of itself, violate the Constitution and that the failure to give

15

such an instruction is to be viewed in light of the totality of the circumstances in determining whether a defendant's right to a fair trial was violated. *Whorton*, 441 U.S. at 789-90. Such totality analysis includes examining "all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors to determine whether the defendant received a constitutionally fair trial." 441 U.S. at 789.

We conclude it was error for the district court not to include a presumption of innocence instruction along with the other jury instructions. See *Taylor*, 436 U.S. at 490. But we decline to hold that it was error, in and of itself, for the district court to utilize the verdict form it did which placed the "guilty" blanks before the "not guilty" blank on the verdict form given its comportment with PIK and the caselaw cited above. See *Llamas*, 298 Kan. at 261-62 (district courts encouraged to use PIK language); *Wesson*, 247 Kan. at 652 (verdict form did not violate defendant's presumption of innocence). The critical question is whether Huffman's right to the presumption of innocence was compromised and thus denied him the right to a fair trial. Answering that question turns on the totality of the circumstances.

First, although the jury was not instructed as to Huffman's presumption of innocence along with the other jury instructions, the State correctly argues that the district court did inform the jury about the presumption of innocence as a preliminary instruction prior to the presentation of evidence. In addition, the jury was correctly instructed, among other things, on the State's burden of proof and the factors to weigh in considering the accuracy of eyewitness identification. Second, neither the State nor the defense mentioned the presumption of innocence in their arguments to the jury.

With regard to the third factor, we agree with the State that the evidence against Huffman was substantial and compelling. Williams had heard that rumors were circulating accusing him of being a snitch. When he made contact with a friend to learn

16

more, a sizeable group of people, including Huffman, was already present and attacked him. After he was knocked to the ground and beaten, Williams was able to discern, despite the darkness, that Huffman was the shooter given his position as the sole attacker positioned near Williams' feet, the shape of his body, and his voice. At trial, Williams testified he was 100 percent sure it was Huffman who shot him, even though during the preliminary hearing he testified that he did not know who shot him. Williams claimed he only testified as such in an effort to avoid sending Huffman to prison. Pegg testified that when he asked Williams who shot him, Williams responded, "[S]ome fool named Skrappy."

In light of the strength of the evidence against Huffman, we are unconvinced that the jury verdict would have been different with a proper presumption of innocence instruction. Moreover, given the totality of the circumstances—the strength of the State's case, the district court's preliminary instruction on the burden of proof, and the failure of any of the parties to raise this issue at trial—we find Huffman was not denied a fair trial. We also find a lack of cumulative error, a point raised by Huffman in his second supplemental brief, because a single error cannot support reversal under the cumulative error doctrine. See *State v. Gonzales*, 307 Kan. 575, 598, 412 P.3d 968 (2018).

III.    IS HUFFMAN REQUIRED TO REGISTER AS A VIOLENT OFFENDER UNDER KORA?

Finally, Huffman argues that he is not required to register as a violent offender under KORA because the district court did not find on the record the Huffman used a deadly weapon in the commission of a person felony as required by K.S.A. 2017 Supp. 22-4902(e)(2). We ordered the parties to submit supplemental briefs on this issue.

Resolution of this issue requires interpretation of K.S.A. 2017 Supp. 22-4902(e)(2), which is a question of law subject to unlimited review. *State v. Marinelli*, 307

17

Kan. 768, 774, 415 P.3d 405 (2018). Our Supreme Court recently summarized the relevant portions of K.S.A. 2017 Supp. 22-4902:

> "Violent offenders are required to register under KORA. See K.S.A. 2017 Supp. 22-4902(a) (defining '"[o]ffender"' to include 'violent offender'); K.S.A. 2017 Supp. 22-4906 (setting duration of registration requirement for offenders). '"Violent offender" includes any person who . . . on or after July 1, 2006, is convicted of any person felony *and the court makes a finding on the record that a deadly weapon was used in the commission of such person felony*.' K.S.A. 2017 Supp. 22-4902(e)(2). Generally, 'an offender's duration of registration shall be . . . 15 years' if the offender is convicted 'of any person felony *and the court makes a finding on the record that a deadly weapon was used in the commission of such person felony*.' K.S.A. 2017 Supp. 22-4906(a)(1)(N)." *Marinelli*, 307 Kan. at 774.

In support of his argument on appeal, Huffman relies on another Kansas Supreme Court case that addressed aspects of KORA and was decided on the same day as *Marinelli*: *State v. Thomas*, 307 Kan. 733, 415 P.3d 430 (2018). The *Thomas* court held that remand was an inappropriate remedy to correct improper or lacking findings by the district court that Thomas required to register under KORA. 307 Kan. at 750. However, the registration issue before us—whether the district court sufficiently found on the record that Huffman used a deadly weapon while committing his crime of conviction—is not controlled by *Thomas* as Huffman suggests. The *Thomas* court held:

> "Because the State did not file a cross-petition for review, we will not review the panel's decision that without a court-made deadly weapon finding in the record, the registration requirement is not triggered. Though in another case decided today, we conclude that such a finding is in fact required before the obligation to register will arise under KORA. See *State v. Marinelli*, 307 Kan. 768, 788-89, 415 P.3d 405 (2018). Here, however, we are limited to reviewing the availability of a remand to 'remedy' any lack of court-made findings." 307 Kan. at 734.

18

Instead, Huffman's argument on appeal—that he has no duty to register because of a procedural defect by the district court's failure to find on the record that the crime was committed with a deadly weapon—is the same as one of the arguments raised in *Marinelli*. There, our Supreme Court held that the district court made the required factual finding obligating Marinelli to register by indicating on the journal entry of judgment that the offender committed the current crime of conviction with a deadly weapon:

"We have no difficulty concluding the necessary finding was part of the district court's determination. The judge and counsel completed the journal entry, which contains the requisite finding and is in the case's record. That essential factual finding was made by checking a box labeled 'Yes' next to the question asking whether an offender committed the current crime with a deadly weapon. The journal entry further reflects that the court informed Marinelli of his duty to register under KORA. And the supplement attached to the journal entry also shows the offender is required to register as a violent offender for '[a]ny conviction for a comparable person felony committed with a DEADLY WEAPON.'

"We further observe that the record supports the district court's finding in the journal entry. The charge specified the deadly weapon used in the commission of the crime was a knife, the State explained that at the plea hearing, and the defense agreed with the State's factual rendition. We emphasize we are not simply looking to whether use of a deadly weapon is an element of the convicted crime. Rather, the uncontroverted record shows the court's finding is supported. Moreover, this is not a situation in which the weapon used constituted a deadly weapon for the purposes of the criminal conviction but was arguably not a deadly weapon for KORA purposes. See *State v. Davis*, 227 Kan. 174, 605 P.2d 572 (1980) (use of a starter pistol elevated crime from ordinary to aggravated robbery). We need not address these potential asymmetries today, but district courts should be alert for them when complying with KORA.

"Because Marinelli was convicted of a person felony and the court found he used a deadly weapon, which is supported by the record, he is a violent offender subject to KORA's registration requirements." 307 Kan. at 788-89.

19

As in *Marinelli*, here the district court made the finding on Huffman's journal entry of judgment that the crime was committed with a deadly weapon. Additionally, the district court made another finding on the journal entry that the crime was committed with a firearm when applying a special sentencing rule. The uncontroverted record on appeal supports the district court's finding. The verdict form specified the crime was committed with a deadly weapon, and the district court explicitly accepted the jury's verdict. Moreover, all of the evidence at trial supported the conclusion that a gun was used to inflict the injuries upon Williams for which Huffman was convicted. Huffman was convicted of a person felony and was found to have used a deadly weapon in the commission of that felony; therefore, he is required to register under KORA as a violent offender.

Affirmed.

\* \* \*

ATCHESON, J., concurring:  I concur in the result. Defendant Daniel R. Huffman has presented no point on appeal amounting to reversible error and thus requiring some form of relief.