NOT DESIGNATED FOR PUBLICATION

No. 118,979

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOHN WILLIE SCOTT JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Geary District Court; RYAN W. ROSAUER, judge. Opinion filed June 21, 2019. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Michelle L. Brown*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., SCHROEDER, J., and MCANANY, S.J.

PER CURIAM: On July 21, 2016, the State charged John Willie Scott Jr., with kidnapping (with an alternative charge of criminal restraint), aggravated assault, and domestic battery. The charges arose out of an altercation between Scott and his wife. Scott's wife testified at his preliminary hearing on November 10, 2016. Scott was bound over for trial on charges of kidnapping and two counts of aggravated assault with a deadly weapon. Scott pled not guilty to the charges at his arraignment on December 16, 2016. Scott remained in jail from the time of his arrest.

In January 2017, Scott's appointed counsel left the public defender's office and withdrew from the case. The court appointed a second lawyer to represent Scott.

1

Thereafter, at a pretrial status hearing on January 20, 2017, Scott entered a written plea agreement under which he pled no contest to amended charges of criminal threat, criminal restraint, and domestic battery. The district court set Scott's sentencing date for April 24, 2017, and released him from jail on a recognizance bond.

While out on bond, Scott left Kansas and went to New York to visit family. His bond was revoked and he was arrested in New York and returned to Kansas where he remained in the county jail until his sentencing hearing.

At Scott's originally scheduled sentencing hearing, he told the court that he wished to withdraw his pleas to the amended charges and go to trial. The court allowed Scott's second lawyer to withdraw and appointed a third lawyer to represent Scott. On June 7, 2017, Scott's third lawyer filed a formal motion requesting that the court allow Scott to withdraw his pleas.

At the initial hearing on Scott's motion, he told the court that he wanted to withdraw his pleas because his wife testified at the preliminary hearing contrary to statements made to the police after the altercation. He said he entered his pleas simply as a way to get out of jail. He told the court that he had requested a transcript of the preliminary hearing testimony, and his third lawyer said it would be forthcoming but Scott had not received it. As a result, he no longer wanted his third lawyer to represent him. The court allowed lawyer No. 3 to withdraw and appointed a fourth lawyer.

*Evidentiary Hearing on Scott's Motion to Withdraw His Pleas*

The initial hearing on Scott's motion was continued to December 19, 2017, at which time the court held a full evidentiary hearing. Scott, along with his first two lawyers, testified at the hearing.

2

*Scott's First Lawyer's Testimony*

Scott's first lawyer testified that in November or December 2016, Scott authorized him to negotiate a plea deal with the State. He and Scott talked about a plea agreement "between five and ten [times]. I don't know for sure." He reached out to the prosecutor about the possibility of a plea agreement, but the prosecutor never responded. Scott's lawyer did not order a transcript of Scott's preliminary hearing. He normally would not do so if he was trying to negotiate a plea agreement with the State. If plea negotiations would not pan out, he would order a transcript and seek a continuance of the trial to make sure the transcript was completed and available for the trial. When he withdrew from the case, he prepared a written memorandum on the case and discussed the case with Scott's second lawyer. He told Scott's second lawyer about Scott's desire for a quick resolution of the matter and the unsuccessful plea negotiations.

*Scott's Second Lawyer's Testimony*

Scott's second lawyer testified that he reviewed the file, including the first lawyer's "transfer memorandum," and discussed the case with Scott's first lawyer. The second lawyer had no concern about Scott's competency since Scott had had a successful competency evaluation before the second lawyer entered the case.

In discussing the matter with Scott, he understood that Scott wanted a plea agreement. He discussed with Scott the conflicting statements made by Scott's wife, but Scott wished to get the case resolved quickly so he could get out of jail. Accordingly, the lawyer did not order a transcript of the preliminary hearing, "[which] would have taken weeks, if not months."

Scott's second lawyer negotiated the plea agreement on Scott's behalf, and the agreement accomplished Scott's goal of a speedy resolution that would get him out of jail.

3

The lawyer's typical routine, which he followed with Scott, was to give the client a copy of the proposed agreement, review it with the client, and give the client a chance to ask questions. Under the plea agreement, Scott would plead nolo contendere to reduced charges of criminal threat and two misdemeanors. At the conclusion of the plea hearing, Scott was released on an OR bond. After the plea hearing, Scott never contacted him about withdrawing his pleas.

*Scott's Testimony*

Scott was age 27 at the time of the hearing. He graduated from high school and attended Erie Community College for 12 credit hours.

Scott testified that he discussed his wife's inconsistent statements with his first lawyer. According to Scott, his lawyer told him that his wife's inconsistent statements would cause the State to seek a plea agreement to resolve the case. Scott said he discussed a possible plea agreement with his first lawyer at nearly all of their meetings, though it was Scott's desire to go to trial.

Scott testified that he told his second lawyer that he wanted the case resolved quickly, but by this he meant he wanted to go to trial as quickly as possible. When his second lawyer told him it would take weeks or months to get the preliminary hearing transcript, Scott understood that to mean the transcript would be unavailable for trial. He had wanted to have the transcript available for use at trial.

Regarding the plea agreement discussions, "[m]y attorney was just saying that I was going to get probation . . . and get out . . . that was just the main things, that was being discussed." Scott read the proposed plea agreement with his lawyer in the county jail. Scott did not have any questions for his lawyer after reading it.

4

Scott testified that at the plea hearing he followed his lawyer's directions about what to say. Scott had been taking some unspecified medication off and on before the plea hearing, but he apparently was not taking any medications at or around the time of the plea hearing.

According to Scott, his lawyer told him that he would be able to withdraw his pleas, and Scott understood this to mean that he could do so without court approval. Scott decided to withdraw his pleas after visiting with his family in New York when he was released on bond.

> "So, I was talking to my aunt, about how my wife lied at the prelim, and how there was different information on the transcripts and the—and the affidavit. And she was telling me that if I can prove that in trial, that it would be to my benefit. So, I was just, like, well, I shouldn't have signed the plea, you know, how come my attorneys never told me that. And that was part of the reason why, like I say, I felt like they were in cahoots. I felt like that's probably the reason why I did not get my transcripts, when I asked for them."

When asked directly why the court should allow him to withdraw his pleas, Scott said the court should do so because he did not understand the plea process and felt tricked by his attorneys into pleading based on their description of his chances for success at trial.

*Scott's Closing Argument*

In closing argument, Scott's current counsel argued that under the first factor in *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006)—the competency of counsel—"I don't think that the . . . Court has any doubt that the counsel that was appointed to Mr. Scott, was competent counsel. What happened here is a chaos of the system, at the particular time that Mr. Scott was faced with his case . . . that actually caused the failures here." She cited "the changeover, in the prosecution, the changeover for Mr. Scott, for his

5

attorney." She later noted that "because everything that was going on within our judicial system, at that point in time, it led to Mr. Scott not being fairly represented."

She argued that Scott's attorneys "fell down" in counseling Scott "on the defense that he had in this case." This related to Scott's wife's conflicting statements, which counsel described in detail:

> "[H]er statement is that he grabbed her from the side. Her testimony was that he grabbed her from the back.
>
> ". . . [Scott's wife] gave conflicting statements about . . . how and when the telephone was dropped, . . . when it was given to Mr. Scott, by her . . . .
>
> "There's the issue of . . . the razor, that [Scott] supposedly had in his hand . . . then he had a knife; that basically was not clear; that he still had the razor, that he still had the knife; there was conflicting statements.
>
> ". . . [Scott's wife] stated she was going to break the window and jump out of the third-floor window. But that isn't what the testimony was. The testimony at the prelim was that she was just trying to get somebody's attention, when she went to the window."

Counsel also argued that Scott was misled in entering his pleas and his pleas were not fairly and understandingly made.

*The District Court's Ruling*

The district court provided an extensive analysis from the bench in denying relief on Scott's motion. The court looked at the first factor in *Edgar*, 281 Kan. at 36. "The [first] is competent counsel. And the defense agrees that the counsel in this case are competent." The court found that Scott's first and second attorneys were competent "in terms of the . . . appropriateness of what they advised Mr. Scott, and their knowledge of the law, and their ability to perform the duties."

6

The court then considered whether Scott was coerced, mistreated, misled, or unfairly taken advantage of. Here, Scott was charged with a level 3 felony that called for presumptive prison of 55 to 61 months and offender registration. He was also charged with aggravated assault which "will add another year onto the sentencing, if the matters are run consecutively." Scott was also charged with a misdemeanor. These were "bargained down to two misdemeanors and a nonregistration felony, with probation. It was on paper . . ., at least, a good deal."

The court found no coercion beyond the "inherent pressures that any defendant faces, when they're in pretrial confinement." Moreover, Scott was not mislead about the plea agreement.

Regarding Scott's wife's inconsistent statements at the preliminary hearing, the court noted that Scott was well acquainted with them. The court observed, "what I'm really hearing is that, looking back on it, perhaps defense counsel gave short shrift to inconsistent statements that were made." But

> "any prosecutor with a basic skill set is going to be able to explain to the jury that in the
> heat of the moment, the victim is not going to remember [every] last detail, and when
> they recite the case under the pressure of being on the witness stand months later, they're
> going to get certain things wrong."

The court also noted that in memorializing a witness' statement, the police are "probably going to get some things wrong too." The court concluded that the differences would not be "enough for a jury to find compelling."

The court did not believe Scott's testimony that his counsel told him he could withdraw his plea whenever he wanted. The court did not believe that Scott, in entering

into the plea agreement, thought "[w]ell, I'll make the plea agreement now. And then, if I change my mind before sentencing, 60 to 90 days out, I'll . . . just change my mind."

The court found no evidence that Scott was incompetent at the time of his plea. Moreover, Scott's plea was understandingly made. "[H]e was aware of the inconsistencies leading up to the hearing. He knew what his choices were. He knew what he was getting out of the plea agreement." There was no dispute that Scott read and understood the plea agreement. In sum, there was no believable evidence that any of the *Edgar* factors supported setting aside Scott's pleas.

*Sentencing*

Ten days later the district court sentenced Scott to consecutive sentences of six months in prison for the criminal threat conviction, six months in the county jail for the criminal restraint conviction, and six months in the county jail for the domestic battery conviction. The court then suspended Scott's sentences and placed him on 12 months of unsupervised probation.

*Scott's Appeal*

Scott appeals. He contends that the district court abused its discretion in denying his motion to withdraw his pleas. He also contends that the court erred in imposing an illegal sentence.

*Analysis*

With regard to Scott's first contention, the rule regarding motions to withdraw a plea before sentencing is that "[a] plea of guilty or nolo contendere, for good cause shown and within the discretion of the court, may be withdrawn at any time before

8

sentence is adjudged." K.S.A. 2018 Supp. 22-3210(d)(1). We review the district court's ruling to determine if it abused its discretion in denying the motion. *State v. DeAnda*, 307 Kan. 500, 503, 411 P.3d 330 (2018); *State v. Schaal*, 305 Kan. 445, 449, 383 P.3d 1284 (2016). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

*The District Court's Standard for Counsel's Performance*

Scott claims on appeal that the lackluster advice and representation of his first two lawyers caused him to enter his guilty pleas. He argues that the district court abused its discretion by erroneously applying the constitutional competency standard rather than the lackluster advocacy standard in evaluating the performance of his counsel.

The three *Edgar* factors generally guide a district court's consideration of whether a defendant has shown the good cause required by K.S.A. 2018 Supp. 22-3210(d)(1) to withdraw a plea prior to sentencing: (1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made. See *Edgar*, 281 Kan. at 36. These factors should not be applied mechanically and to the exclusion of other factors. *State v. Fritz*, 299 Kan. 153, 154, 321 P.3d 763 (2014). These factors establish "'viable benchmarks'" for the district court when exercising its discretion, but the court should not ignore other facts that might exist in a particular case. *State v. Schaefer*, 305 Kan. 581, 588, 385 P.3d 918 (2016).

Scott argues the first *Edgar* factor regarding competency of counsel, standing alone, gave him good cause to withdraw his plea.

To understand Scott's contention, we must first examine in detail our Supreme Court's four to three ruling in *State v. Aguilar*, 290 Kan. 506, 231 P.3d 563 (2010), upon which Scott relies.

In *Aguilar* the court found "particularly egregious facts." 290 Kan. at 515. Aguilar and her close family friend, Leona Ayalla, were the subject of a traffic stop. There were outstanding arrest warrants for both of them. The police conducted an inventory search of the car and discovered cocaine under the seat where Aguilar was sitting and additional drugs on Ayalla's person. Both were charged with drug crimes.

Ayalla and Aguilar retained the same attorney to represent them. His fee was $1,500 if they both pled guilty and $3,000 if they went to trial. He later moved to withdraw in Aguilar's case because she had failed to pay the agreed fee, and the attorney asserted that this made it impossible for him to zealously represent her. Nevertheless, three days later, and before the motion was ruled on, both Ayalla and Aguilar entered guilty pleas in line with plea agreements with the State. At the plea hearing that followed, the district court accepted the pleas without inquiring into the possible conflict arising from the lawyer representing both Ayalla and Aguilar on charges arising out of the same transaction.

Then, before sentencing, Aguilar moved to withdraw her plea. She contended that she entered into the plea agreement and pled guilty under duress because of her close relationship with Ayalla and the fact that her lawyer said she could save substantial legal fees, which she could not afford, by pleading guilty along with Ayalla. She claimed that her lawyer had a conflict of interests in representing both her and Ayalla in these cases. The district court denied relief following the evidentiary hearing on Aguilar's motion.

On appeal, the Supreme Court cited *State v. Schow*, 287 Kan. 529, 541, 197 P.3d 825 (2008), for the distinction drawn between a motion to withdraw a plea before

10

sentencing and such a motion asserted after sentencing. The good cause needed to withdraw a plea before sentencing is a lesser standard for a defendant to meet than the manifest injustice standard needed to set aside a plea after sentencing. Deciding whether a defendant has met the good cause standard for setting aside a plea before sentencing is within the district court's discretion. Success for such a motion asserted after sentencing is predicated on a showing of manifest injustice, a more stringent requirement. *Schow*, 287 Kan. at 541.

> "[I]t may be logical and fair to equate the K.S.A. 22-3210(d) manifest injustice standard governing a post-sentence plea withdrawal motion to the high burden imposed on a constitutional claim of ineffective assistance. [Citations omitted.] . . . [T]he plain language of the statute—'for good cause shown *and within the discretion of the court*'— should not be ignored. A district court has no discretion to fail to remedy a constitutional violation.

> "It is neither logical nor fair to equate the lesser K.S.A. 22-3210(d) good cause standard governing a presentence plea withdrawal motion to the high constitutional burden. The *Edgar* factors do not transform the lower good cause standard of the statute's plain language into a constitutional gauntlet. Merely lackluster advocacy—or, as here, evidence of an insurmountable conflict of interest[s] among jointly represented codefendants that is ignored by a district judge—may be plenty to support the first *Edgar* factor and thus statutory good cause for presentence withdrawal of a plea." *Aguilar*, 290 Kan. at 513.

The district judge who took Aguilar's plea failed to address counsel's conflict of interests and "the financial pressure placed on Aguilar by [her lawyer's] package deal for her representation, good only as long as she remained joined at the hip to Ayalla." 290 Kan. at 515. With respect to the first *Edgar* factor regarding competency of counsel, the judge merely observed that he was familiar with Aguilar's lawyer and "'I think he does a good job.'" *Aguilar*, 290 Kan. at 515. This observation did not address the performance of Aguilar's lawyer in the case then before the court. In ignoring the conflict issue, the

district court ignored "the main issue to be addressed." 290 Kan. at 515. The Supreme Court concluded that Aguilar satisfied the good cause showing necessary to set aside her plea and set aside the district court's ruling on Aguilar's motion. 290 Kan. at 515.

In the later decision in *State v. Schaefer*, 305 Kan. 581, 589, 385 P.3d 918 (2016), the court considered another presentencing motion to withdraw a plea; this time, under the "lackluster performance" standard announced in *Aguilar*. Schaefer raised issues regarding each of the *Edgar* factors: (1) the competency of his counsel; (2) whether he was coerced into entering his plea; and (3) whether his plea was fairly and understandingly made. With respect to the first *Edgar* factor, Schaefer claimed his lawyer's performance was inadequate because he failed to advise Schaefer that by pleading nolo contendere to amended on-grid charges of rape and attempted rape he might be exposed to possible involuntary civil commitment under the Kansas Sexually Violent Predator Act (KSVPA). The district court denied relief, finding that Schaefer was represented by competent counsel.

Unlike in *Aguilar*, Schaefer's appeal did not involve any claim of a conflict of interests. But he relied on *Aguilar* in arguing that "he does not have to prove that his attorney was unconstitutionally ineffective, but rather '[m]erely lackluster advocacy . . . may be plenty to support the first *Edgar* factor and thus statutory good cause for presentence withdrawal of a plea.' *Aguilar*, 290 Kan. at 513." *Schaefer*, 305 Kan. at 589. The *Schaefer* court confirmed that "the test for competent counsel when determining good cause to withdraw a plea is something less than the test to determine constitutionally effective assistance of counsel." 305 Kan. at 597.

Citing K.S.A. 2015 Supp. 22-3210(d), the Supreme Court noted that Schaefer's burden was to show good cause for withdrawing his plea, rather than the more stringent burden of manifest injustice. 305 Kan. at 587-88. In considering the matter, the district court was not confined to the *Edgar* factors but could consider other factors that may

12

come into play in a particular case. On appeal, Schaefer argued that the district court abused its discretion in ignoring factors other than the three *Edgar* factors.

In affirming the district court, the Supreme Court disposed of Schaefer's claim that the district court abused its discretion by applying the wrong legal standard—i.e., only the *Edgar* factors and not the "lackluster performance" standard of *Aguilar*—by noting that the district court:

- issued a thorough decision detailing its reasons for dening the motion;

- considered the points raised in Schaefer's testimony and his statements at his plea hearing; and

- considered the context in which Schaefer entered his plea. *Schaefer*, 305 Kan. at 589.

Returning to our case, Scott contends that the district court failed to apply the lackluster standard in deciding whether he had shown good cause to withdraw his pleas. He argues that rather than applying the "less stringent" good cause standard for measuring the performance of his counsel, the district court applied the "heightened" Sixth Amendment constitutional standard.

We see no indication that the district court erroneously applied a heightened standard for Scott to meet. The district court explicitly applied the *Edgar* factors in resolving Scott's motion. The *Edgar* factors remain "viable benchmarks for judicial discretion" in deciding a presentencing motion to withdraw a plea. *Aguilar*, 290 Kan. at 512. This includes the first *Edgar* factor regarding attorney competence. Under the holding in *Aguilar*, an attorney's performance that is merely lackluster satisfies the

13

movant's burden of showing that the first *Edgar* factor has not been satisfied and that the presentencing motion should be granted.

In its analysis, the district court did not explicitly refer to the lackluster test for lawyer competence under the first *Edgar* factor. Nor did the court refer to the more demanding constitutional standard for ineffective assistance of counsel. But the court's analysis was consistent with both *Aguilar* and *Schaefer*—in substance and in the comprehensiveness of its analysis—and demonstrated that Scott's lawyers were not lackluster in their representation.

The *Aguilar* court did not explain what constitutes a lackluster performance. But Webster's New World College Dictionary 812 (5th ed. 2014) defines lackluster as "lacking energy or vitality; boring, unimaginative, etc." On the other hand, that same dictionary defines "effective" as "producing a definite or desired result." Webster's New World College Dictionary 464 (5th ed. 2014).

In Scott's closing argument on his motion, his counsel enumerated Scott's complaints but essentially conceded that Scott's lawyers were competent. The district court agreed and found that they were appropriate in how they advised Scott. But the court then went on to analyze Scott's complaints about his lawyers, which centered on their failure to provide him with a transcript of the preliminary hearing and about their urging him to plead rather than go to trial. The thrust of Scott's argument is that these complaints demonstrate the lackluster character of his lawyers' performance.

Substantial evidence supports the district court's finding that Scott's counsel satisfied the competency requirement in *Edgar*. Scott's first lawyer testified that the driving force behind the plea agreement was Scott's desire to get out of jail as quickly as possible. He and Scott talked about a plea agreement between 5 and 10 times during the months he represented Scott. He attempted to carry out Scott's wishes, but he was unable

14

to get the prosecutor to engage in any plea negotiations. He did not order a transcript of the preliminary hearing because of Scott's desire for a quick plea deal. But he explained that if plea negotiations were unsuccessful, he would have ordered the transcript and made sure it was available for trial.

Scott's second lawyer discussed with Scott the conflicting statements Scott's wife made but did not pursue the issue because of Scott's concern for a speedy resolution of the case that would get him out of jail. Moreover, the rather trivial conflicts in the wife's testimony, as outlined in Scott's closing argument, were hardly sufficient to warrant abandoning Scott's desire for a speedy resolution of the case.

Scott's second lawyer was able to negotiate an agreement which the district court characterized as "a good deal." He gave Scott a copy of the proposed agreement and reviewed it with him. Scott had no questions about it. As a result of the agreement and Scott's agreed pleas, he was released on bond, which was his immediate objective. (Moreover, as an aside, Scott ultimately was placed on unsupervised probation which was what he said his lawyer predicted.) Consistent with the evidence, the district court found that Scott's lawyers did not pressure him into entering his pleas.

Finally, with regard to Scott's claim that his second lawyer told him he could withdraw his plea at any time, the court simply rejected it as incredible. In our review we do not second-guess the district court on matters of credibility. *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016).

The district court correctly found that the performance of Scott's lawyers met the *Edgar* competency standard. While the district court did not use any "magic words" to characterize their performance, the court did not burden Scott with the Sixth Amendment constitutional standard for measuring counsel's performance. Moreover, our review of the evidence leads us to conclude that the performance of Scott's lawyers was competent and

15

effective—and far from lackluster. The district court did not abuse its discretion in denying Scott's motion to withdraw his plea.

*Scott's Claimed Illegal Sentences*

Scott contends that his sentences are illegal because they violate K.S.A. 2018 Supp. 21-6819. A sentence is illegal if it does not conform to applicable statutory provisions. K.S.A. 2018 Supp. 22-3504(3). A court may correct an illegal sentence at any time. K.S.A. 2018 Supp. 22-3504(1); *State v. Fisher*, 304 Kan. 263, 264, 373 P.3d 781 (2016). Because this raises issues of statutory construction, our review is unlimited. See *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015).

In considering these claims we must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016). When a statute is plain and unambiguous, we do not speculate about the legislative intent behind that clear language, and we do not read something into the statute that is not readily found in its words. If the statute is not ambiguous, we need to resort to the tools of statutory construction. Only if the statute's language is unclear or ambiguous do we turn to the canons of construction or to the statute's legislative history to determine the Legislature's intent. 303 Kan. at 813.

Finally, if our Supreme Court has already considered and decided the issue, we are duty bound to follow its holding on the issue unless we have some indication the Supreme Court is departing from its previous position. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015).

*Multiple Sentences Under K.S.A. 2018 Supp. 21-6819*

The district court sentenced Scott to consecutive sentences of six months in prison for the criminal threat conviction, six months in the county jail for the criminal restraint conviction, and six months in the county jail for the domestic battery conviction. The court then suspended Scott's sentences and placed him on 12 months of unsupervised probation.

Scott cites K.S.A. 2018 Supp. 21-6819(b)(1) for the proposition that "[w]hen the sentencing judge imposes multiple sentences consecutively, the consecutive sentences shall consist of *an* imprisonment term which may not exceed the sum of the consecutive imprisonment terms, and a supervision term." (Emphasis added.) Moreover, under K.S.A. 2018 Supp. 21-6819(b)(6), "[i]f the sentence for the primary crime is a prison term, the entire imprisonment term of the consecutive sentences will be served in prison." Under K.S.A. 2018 Supp. 21-6803(r), "'[P]rison' means a facility operated by the Kansas department of corrections"; and under K.S.A. 2018 Supp. 21-6803(m), "'[I]mprisonment' means imprisonment in a facility operated by the Kansas department of corrections." Based on these statutory definitions and mandates, Scott contends that the district court imposed illegal sentences when it ordered him to be incarcerated at different facilities— in the county jail for two consecutive six-month sentences and in KDOC custody for a six-month prison term.

Our Supreme Court previously addressed this issue in *State v. Huff*, 277 Kan. 195, 83 P.3d 206 (2004). Huff pled guilty to attempted robbery, felony possession of marijuana, misdemeanor theft, and two counts of misdemeanor child endangerment. The district court imposed concurrent sentences on her two felony convictions, resulting in a controlling prison term of 16 months. The court also imposed consecutive 12-month jail sentences for each of her three misdemeanor offenses, to run consecutive to her primary offense of attempted robbery.

17

Huff claimed her sentence was illegal because the district court had no statutory authority to impose consecutive sentences for her misdemeanor convictions. Her argument hinged on whether incarceration in the county jail constitutes imprisonment. Kansas law provides that the court can impose concurrent or consecutive sentences when imposing sentences of imprisonment for different crimes. She argued that "the term imprisonment is reserved for felony crimes involving incarceration in a facility operated by the Kansas Department of Corrections. Misdemeanor convictions call for *confinement* instead of imprisonment with incarceration in a jail instead of the Kansas Department of Corrections." 277 Kan. at 199. Thus she contended that in sending her to the county jail for her misdemeanor offenses, the district court did not have the option of imposing consecutive periods of confinement.

The Kansas Supreme Court cited the Kansas Court of Appeals decision in *State v. Reed*, 23 Kan. App. 2d 661, 934 P.2d 157 (1997). The Supreme Court also compared various sections of the Kansas Criminal Code and determined the terms "imprisonment" and "confinement" were used interchangeably. *Huff*, 277 Kan. at 200. Ultimately, the Supreme Court concluded the district court had authority to impose consecutive sentences for misdemeanors. 277 Kan. at 207. In doing so, the court declared that "K.S.A. 2002 Supp. 21-4720(b) does not apply to misdemeanor cases." 277 Kan. at 197-98.

In 2011, K.S.A. 21-4720(b) was renumbered to K.S.A. 21-6819(b), but the language of the statute remained largely the same. L. 2010, ch. 136, § 300. K.S.A. 2018 Supp. 21-6819(b)(6), on which Scott's case relies, remained untouched. The changes made to K.S.A. 2018 Supp. 21-6819(b)(1) are unrelated to Scott's argument. Likewise, the definitions of "imprisonment" and "prison" are unchanged from when *Huff* was decided. *Huff* remains controlling law and we are bound to follow it. *Meyer*, 51 Kan. App. 2d at 1072.

*The Double Rule*

Finally, Scott contends that the sentence imposed by the district court violated the "double rule." The double rule states: "The total *prison* sentence imposed in a case involving multiple convictions arising from multiple counts within an information, complaint or indictment cannot exceed twice the base sentence." (Emphasis added.) K.S.A. 2018 Supp. 21-6819(b)(4).

Scott argues that because he was sentenced on multiple convictions charged in the same information, his term of incarceration cannot be more than twice the six-month prison base sentence for the felony criminal threat charge. But Scott's two other six-month sentences for domestic battery and criminal restraint were to be served in the county jail, not in prison. K.S.A. 2018 Supp. 21-6819(b)(4) specifically refers to the "prison" sentence, and prison specifically means a facility operated by KDOC. See K.S.A. 2018 Supp. 21-6803(r). Although "imprisonment" applies to misdemeanors, prison and county jail are not interchangeable terms, and we may not read something into the statute that is not readily found in its words. See *Barlow*, 303 Kan. at 813. Accordingly, Scott's sentence does not violate the double rule.

Affirmed.